[Crim. No. 3020. Third Dist. Feb. 26, 1960.]

THE PEOPLE, Respondent, v. EUGENE L. STURGESS, Appellant.

436

C. E. O'Neill, under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, Doris H. Maier and Raymond M. Momboisse, Deputy Attorneys General, for Respondent.

VAN DYKE, P. J.—On May 28, 1959, in Yolo County, California, a jury found appellant guilty of murder in the first degree. On the following day on stipulation that the question of penalty should be submitted to the same jury on the evidence introduced at the trial on the question of guilt the jury fixed the penalty at life imprisonment. On June 2d following, the trial of appellant's plea of not guilty by reason of insanity was tried to the same jury, which found him sane. Motion for new trial was denied and judgment was entered. Thereupon appellant filed with the clerk of the superior court a notice that he thereby appealed his "case." We construe this notice as an appeal both from the judgment and from the order denying appellant's motion for a new trial.

On Friday, February 27, 1959, between 6 and 7 o'clock a.m., James Koeber was working with his chickens. Assisting him was Dr. Freeman and LeRoy Horner who, with his family, was living in a trailer about 50 yards south of Koeber's home. The three were engaged in treating Koeber's chickens. After leaving their work the two men left. About 9 p.m. on the next day Koeber's body was found on the floor of his chicken house. He had died from a gunshot wound in the chest. The entrance door to the chicken house was latched. No weapon was found near the body. There was a powder burn on the victim's jacket. Sunday morning, March 1st, appellant visited Horner's trailer and talked with Horner to whom he said he had come to take away a small trailer near Koeber's house which belonged to appellant. Appellant told Horner he had a lease on Koeber's land which had become effective January 1st preceding, but that he had allowed Koeber to remain on the ranch until that morning. Appellant then went to Koeber's house where he conversed with a deputy sheriff who was investigating the homicide. He told the deputy that Koeber and he were friends of long standing and that he, appellant, had a lease of the property which had been drawn by an attorney in Sacramento on the 1st or 2d of January and under which he was to take possession on the 1st of March. He said he had paid Koeber $350, $240 of which was to cover the rental on the three acres where the house was situated, and that the balance had been for a cow which he had purchased from Koeber. The officer told appellant he wanted to see the

lease and that he would visit appellant's home for that purpose. On the same day appellant visited one Gray, taking with him a bottle of wine from which he poured a glass for each. He appeared to be restless and stated that he was. After the drink, he said that there was trouble over Koeber's place; that he had been over there and the place was full of cops and deputies; that someone had shot Koeber and that they had found him in the chicken house where he was shot, but that appellant didn't know whether he had been shot some place else and dragged there or whether he was shot there, but he added that it looked to him as if he would be able to get the Koeber place as he had "everything in black and white," and that he had a lease on the property. Earlier appellant had visited Gray and told him that he wanted to lease Koeber's ranch. This visit occurred sometime between the 1st of January and the time of the homicide. On another visit prior to the homicide he told Gray that he wanted him to come into appellant's house so he could show Gray something. He then showed Gray a typewritten document, a will, and said Koeber was going to leave some money to Koeber's daughter and her children and then the rest would go to appellant. Appellant referred to Koeber as quite an aged, feeble man, saying it didn't look like Koeber would live very long. He asked Gray if he would write out a will in his handwriting the same as that will was worded which he, the appellant, said he had made out and that he had a card with Koeber's name on it from which Koeber's signature could be traced. Gray told appellant that such actions would be wrong. Appellant told Gray that if he would do as suggested he would give him $500 when he got the property. On January 13, 1959, appellant contacted an attorney and requested him to draw a deed of gift from Koeber to appellant. He gave the attorney appellant's proper name and a part of the legal description of Koeber's property. From that information and additional information the attorney obtained, a deed of gift was drawn which appellant took away. This deed was found in appellant's bedroom after Koeber was killed. It purported to convey Koeber's land to appellant and his wife, reserving a life estate in Koeber. The deed was signed, but the signature of Koeber was shown to have been forged thereon by appellant. On February 3d appellant requested the same attorney to prepare a lease from Koeber to him of Koeber's land and this was done. Appellant signed the lease and the signature was acknowledged in the attorney's office. Appellant took the

document away, saying that he would get Koeber's signature, have it acknowledged, and record the instrument. When the deputy sheriff, pursuant to the previous arrangement, went to appellant's house to see the lease appellant exhibited it. The lease was for five years, called for part cash rental and a 50 per cent net profit rental on the balance of the land. The lease also covered all equipment on the land. Koeber's signature to this lease had also been forged by appellant. After Koeber's death there was found in a bureau in appellant's bedroom an agreement of sale purporting to sell Koeber's land to appellant for $15,000. It recited a down payment of $240 and provided for yearly payments of $500 on the balance. It contained a statement that the price was lower than the prevailing market value of the land and it also contained a provision that upon the death of Koeber the balance of the indebtedness should be cancelled and complete title should pass to appellant. This document had been prepared by the same attorney, and appellant told him that Koeber had refused to sign the deed of gift previously prepared, but that he would enter into this agreement of purchase and sale. On one of the visits to the attorney's office, appellant told the attorney that Koeber wanted to have a will drawn and that he would bring Koeber in to the attorney's office so that could be done. Koeber never appeared in the attorney's office, but after the interview the attorney received a will purporting to be Koeber's, attached to which was a notation: "My will. Take care of it. Notify M. Sturgess." This note had purportedly been signed by Koeber, but appellant admitted that he had mailed the will to the attorney and it was shown that he had forged the entire handwritten document and the signature of Koeber thereto. The document purported to be entirely written, dated and signed in the handwriting of Koeber. In a dresser drawer in appellant's bedroom there was found another document which was a purported will of Koeber identical to the one just discussed. Appellant admitted that he had written this purported will, including the signature thereto of Koeber. When shown the testamentary document he had mailed to the attorney, appellant denied that he had written it, but at the request of the officer he proceeded to write the same material as it was dictated to him. His handwriting was shown to be similar to that of the document and to have contained some of the same misspelled words as were misspelled in the purported will he had sent to the attorney. Nevertheless, after having given the exemplar he denied he had signed the lease and denied

that he had signed or written the will, but shortly thereafter admitted that he had written the will and forged the signature on the lease. On a rafter brace in appellant's chicken house on his property there was found a box containing .32 caliber cartridges complete with load, five of which had grooves cut into the top of the bullets. The bullet that killed Koeber had similar grooves and was of the same caliber and of the same size and design as those found at appellant's chicken house. When appellant, who was in jail, was told that the officers were going over his ranch with a mine sweeper he asked his stepson-in-law who visited him to go to appellant's ranch and pick up an old gun that he did not want anyone to find. He furnished a map indicating where the gun was to be found and the gun was found buried under 10 inches of litter, hay and debris, wrapped in a cloth. The muzzle of the gun had been battered and it could not be test fired, but the design of the rifling on the gun matched the rifling found on the bullet that killed Koeber. One of its chambers had been fired more recently than the rest. Appellant took the stand in his own behalf and denied most of the testimony concerning matters we have above related.

On the issue of guilt under the not guilty plea appellant challenges the sufficiency of the evidence to sustain the verdict of murder in the first degree, asserting that, taken at its best, it is sufficient only to sustain the conviction of second degree murder and cannot support an implied finding of premeditation. We find no merit in this contention. Direct evidence of premeditation is not required and such premeditation may be inferred from proof of such facts and circumstances as will furnish a reasonable foundation for such inference. (*People* v. *Guldbrandsen,* 35 Cal.2d 514, 519 [218 P.2d 977]; *People* v. *Caritativo,* 46 Cal.2d 68 [292 P.2d 513].) In *People* v. *Caritativo* the Supreme Court, reciting the facts shown there which it declared sufficient to support a finding of premeditation, said:

"The evidence in the instant case, showing that defendant forged the purported will and codicil as well as the suicide note; had access to Mrs. Banks' personal papers; that his knife was used to murder Mr. Banks; and he had placed liquor bottles, which he had stolen from his employers, at the scene of the murder, all support the jury's finding that defendant deliberately, wilfully and with premeditation murdered the decedents."

What we have heretofore said concerning the evidence of

guilt is as strong, if not stronger, than the evidence held sufficient in *Caritativo* to support a finding of premeditated murder. ■ Appellant contends that his substantial rights were violated when the testimony of the attorney who drew the documents hereinbefore referred to was admitted into evidence, and that his rights were also violated when the purported will of Koeber which had been entrusted to the attorney was turned over to the authorities and introduced into evidence at·the trial. These charges rest upon appellant's claim that all communications between him and the attorney and all papers entrusted to the attorney by him were privileged communications under section 1881, subdivision 2, of the Code of Civil Procedure. We cannot consider these matters on the merits since the record shows that there was no objection made at the trial to the introduction of the evidence.

■ The burden of establishing the privileged nature of confidential communications between an attorney and client is upon the parties seeking to suppress the evidence. (*Tanzola v. De Rita*, 45 Cal.2d 1, 6 [285 P.2d 897].)

■ Passing now to the trial on the issue of sanity we have in the record, in addition to the evidence upon the issue of the plea of not guilty hereinbefore related, additional testimony mainly by experts on one side or the other concerning appellant's sanity. ■ When insanity is raised as a defense in a criminal case, the burden is on the defendant to prove insanity by a preponderance of the evidence. (*People v. Daugherty*, 40 Cal.2d 876, 900 [256 P.2d 911].) ■ The defendant must establish his legal insanity and the definition of such insanity has been stated as follows: "[T]hat at the time the accused committed the act he was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of his act or, if he did know it, that he did not know that he was doing what was wrong." (*People v. Nash*, 52 Cal.2d 36, 39 [338 P.2d 416] (footnote) ; *People v. Berry*, 44 Cal.2d 426, 433 [282 P.2d 861].) ■ Experts gave it as their opinion that appellant had been mentally ill for many years and that the onset of age had been a factor in making his illness more severe. Concerning appellant's knowledge as to what he was doing, one doctor testified: "I feel that he was aware of what he was doing, but that because of his mental state he did not have a concise and precise knowledge. In other words, there is a quality of knowing. I feel that this man was aware of what he was doing, but I feel that his mental state was confused,

his mental state was such that the knowledge was not concise, clear, and that his perception was not to the degree that you or I might have a perception of the act." The witness went on to say that appellant knew when he did what he did that it was wrong, that he knew the difference between right and wrong at the time in the sense that he was aware that it was a wrongful act, but that he had not a clear and concise knowledge of the wrongfulness of the act. A second alienist testified that he was of the opinion the appellant had been mentally ill for a long period of time and his age had added to his mental illness. He was of the opinion that the appellant was mentally ill and was not responsible for the offense he had committed as he would not have committed the act if he had not been mentally ill. But he said that he believed the appellant knew the nature and quality of his act in the sense that he knew what he was doing. This alienist also drew a distinction between awareness and knowledge. He said the appellant was aware of his act but that he questioned whether he knew its wrongfulness. Considering the whole record upon the issue of sanity a reviewing court can only say the evidence was sufficient to sustain the jury's finding of sanity.

Finally, appellant contends that on the trial of the issue of insanity a juror was permitted to question one of the alienists. The following occurred: "The Juror: Doctor Lieberman, my question, sir, is this: Is it possible that the defendant in his condition is not capable or, let us say, is devoid of those emotions which relate to a sense of guilt, pity, cruelty, or any emotional reactions which would interfere with perpetrating an act directed by his delusional convictions? The Witness: You refer to certain emotions that he might be devoid of. Actually, a man in his mental condition has all of these emotions, but they are so distorted that they come out looking differently, and it's a matter of confusion of emotions. Whereas you and I may demonstrate an emotion so that it is well understood, the emotion that he would demonstrate comes out in such a distorted manner that it is not understood. The Juror: Am I to infer from your answer that the value of emotions in establishing judgment is much impaired in a case like this? The Witness: The value of emotions in establishing judgment is much impaired in a case like that. I would say that is true." No objection was registered to the juror's questioning of the witness and the testimony elicited by the juror was in consonance with that given by the alienist on examination by counsel. The answers elicited might have been favorable to the appellant which might account for there

having been no objection at the trial.  However that may be, the lack of any objection amounts to such a waiver that it would be fruitless for us to discuss the issue further.

The judgment and the order appealed from are affirmed.

Schottky, J., and Warne, J. pro tem.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 20, 1960.  Peters, J., was of the opinion that the petition should be granted.

*Assigned by Chairman of Judicial Council.