[Crim. No. 9883. First Dist., Div. Four. July 12, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL D. POULIN, Defendant and Appellant.

**COUNSEL**

Jack Siedman, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Eric Collins and Nancy S. Reller, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BRAY, J.**\*—Appellant appeals from judgment of conviction, after jury trial, of violation of Penal Code section 12310 (explosion of a destructive device causing great bodily injury).

### Questions Presented

1. Is Penal Code section 12310 unconstitutional because the term "great bodily injury" fails to establish a clearly defined standard of guilt?

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

2. Does the evidence support a finding of "great bodily injury"?

3. Was the instruction on great bodily injury erroneous?

4. Was the admission of the testimony of the bailiff error?

5. Was the admission of testimony in regard to prior offenses error?

6.[1] Was appellant's counsel incompetent thereby depriving appellant of his Sixth Amendment right to counsel?

a. Failure to raise constitutionality of Penal Code section 12310.

b. Alleged failure to make adequate investigations.

c. Failure to impeach Mrs. Greene's credibility by raising the issue of her psychiatric treatment.

d. Failure to object to bailiff's testimony.

e. Trial court denied appellant an opportunity to question his counsel's competence.

f. The identification of appellant by witness Hogue.

### Record

Appellant was charged in an information filed in San Mateo County Superior Court with violation of Penal Code section 12310[2] and, after jury trial, he was convicted as charged. He waived his right to a jury trial on the penalty phase and was sentenced to state prison for the term prescribed by law.

### Facts

Mrs. Wanda Sharon Greene (hereinafter referred to as "Sharon") became acquainted with appellant in April of 1970. Their acquaintanceship developed into an intimate relationship. On September 3, 1970, appellant telephoned Sharon asking her to accompany him to the Russian River. She informed him that she was going to see Hugh Towzey that night. The next morning at about 5 a.m., appellant was pounding at the door of Sharon's apartment. Appellant assumed that Towzey was there. Appellant refused

---

[1]Appellant filed in this court a petition for writ of habeas corpus based upon the identical contentions referred to in Question 6. As these contentions are answered herein unfavorably to appellant, that petition was dismissed (1/Crim. 10325).

[2]Appellant was additionally charged with violation of Penal Code sections 664, 187 (attempted murder). This count of the information was dismissed.

to leave and Sharon called the police, who persuaded appellant to leave. About five minutes later, appellant phoned Sharon, threatening her.

On September 8, appellant waited for Sharon outside her place of employment, forced her into his car, and drove her to her apartment. He made her telephone her employer that she would not be in that day. He took Towzey's address and phone number from her address book. Telling Sharon that if she valued her family and her life she would do as he said, appellant forced her to drive to his apartment in San Jose. He then told her that he had arranged to have someone harass her. Sharon reported this to the San Carlos Police Department.

During the following month appellant continually followed and telephoned Sharon. She changed her telephone number. He obtained the number through, as he told her, friends in the phone company. He said that his love had turned to hate and he could hurt her better by hurting the people she loved, that she would never be able to hide from him, and that he would take retribution for the harm he felt had been done to him.

Appellant repeated the threatening phone calls, in one of which he said that someone in Sharon's family could be hurt, and that she would not want her son to be missing.

On September 15, appellant tried to run Sharon's car off the road. On one occasion he threatened Leonard Clarenbach, Sharon's stepfather. Appellant constantly parked across the street from the Clarenbach home. On September 25, Officer Donlon, of the San Carlos Police Department, responded to a radio call informing him that appellant was parked across the street from the Clarenbach house, where Sharon was then staying, and harassing Sharon. Appellant denied knowing Sharon or any other resident in the house. On October 1, Towzey's car was bombed.

There were other incidents traceable to appellant indicating that he was continuing to harass and threaten Sharon, Clarenbach and Towzey, in spite of being warned in court to stay away from Sharon and warnings from the district attorney's office.

On December 16, Sharon was at a service station; appellant pulled in alongside her car. He advised her about the court appearance coming up in January on one of her complaints. She said she could do nothing about it as her stepfather was helping her and she was being advised by the district attorney's office.

Two days later, when Clarenbach came out of his house, he started to pick up a paper carton lying in the driveway. It exploded, injuring him as

hereinafter set forth. Wire found in appellant's apartment and that recovered from the explosion were the same kind of wire—ethyl cellulose insulated wire. It was testified that the wires could possibly have been adjacent pieces of wire in the bomb. The switch used in the explosion was purchased three days before by appellant. He admitted attempting to alter the job tag number on the switch. Adams, a former cellmate of appellant's, testified that appellant had solicited him in January to place a bomb in somebody's car, saying that the proposed victim had wronged him, that appellant had warned him once and now wanted him done away with for good. The car to be bombed was Towzey's. Appellant also asked Adams to put a knife in the chest of his girl friend's child.

Appellant admitted buying the switch. He intended to use it in a burglar alarm at his shed. He denied threatening Sharon, soliciting Adams, or having anything to do with the bombing of Towzey's car or the bomb which injured Clarenbach.

William Windle, the court bailiff, testified that while Clarenbach was drawing a diagram of the bomb Windle was seated at the far end of the jury box and heard appellant tell his attorney, "It was not quite like that."

### 1. *Penal Code section 12310 is not unconstitutional.*

Appellant contends that the term "great bodily injury" under Penal Code section 12310 is unconstitutionally vague in failing to establish a clearly defined standard of guilt. Penal Code section 12309 contains substantially the same language, but speaks only of "bodily injury" rather than "great bodily injury." The punishment prescribed under Penal Code section 12309 is not less than 15 years; that under section 12310 is death or imprisonment for life. Appellant claims that, due to the great disparity between possible punishments under the two sections, it is imperative that a clear distinction be drawn between the acts prohibited.

Penal Code section 12310 is relatively new (effective August 19, 1970) and there is no case dispositive of the issue appellant has raised. However, the term "great bodily injury" is employed in other sections of the Penal Code: section 213 (robbery with the infliction of great bodily injury); section 264 (rape with the infliction of great bodily injury); section 461 (burglary with the infliction of great bodily injury); and section 245 (assault by force likely to produce great bodily injury).

Lack of precision itself, in a criminal statute, is not offensive to the requirements of due process. " '[T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys

sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. . . .' [Citation.] . . . '. . . That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too' ambiguous to define a criminal offense. . . .' [Citations.]" (*Roth* v. *United States* (1957) 354 U.S. 476, 491-492 [1 L.Ed.2d 1498, 1511, 77 S.Ct. 1304].)

"A statute is not necessarily invalid even though in its definition some matter of degree may be involved; it will not generally be held invalid if the language is sufficient to enable the attorney to explain to his client and advise what questions may be left to the determination of the jury, so that he will be able to govern himself accordingly; neither is it necessary that the words have a universally recognized meaning; that the charging words will ordinarily be held sufficient if their meaning can be fairly ascertained by references to similar statutes or other judicial determinations, or by reference to the common law, or to the dictionary, or if the words themselves had a common and generally accepted meaning; that the long continued use of words in a statute without question as to their sufficiency creates a presumption that they have come to be well understood by those to whom they apply. . . . That the courts will consider the underlying purpose of the law and although it might desire a little more certainty, as a general rule the court will uphold the validity of the statute and interpret it to the best of its ability, particularly when any attempt to make it more specific and certain, would tend to nullify its fundamental purpose. . . . that where the statute involves some matters of degree as to which individuals and even jurors might reasonably disagree in their judgment, the statute will not for that reason alone be invalidated, . . ." (*People* v. *Daniel* (1959) 168 Cal.App.2d Supp. 788, 797-798 [337 P.2d 247].)

■ With the foregoing principles in mind, the term "great bodily injury" is sufficiently certain and definite to meet the constitutional requirements.

The legislative intent behind enactment of Penal Code sections 12309 and 12310 was to devise two degrees of punishment for persons who explode or ignite any destructive device or explosive resulting in personal injury to another: the higher punishment under section 12310 is where the victim suffers "great bodily injury"; the lesser punishment under section 12309 is where the victim suffers merely "bodily injury."

While perhaps a bit more certainty would be desirable in the terminology employed in section 12310, any attempt to render such terminology more specific would tend to nullify the fundamental purpose behind the statute.

The statutes in question patently deal with a matter of degree as to the injury suffered by the victim; while individuals or jurors might reasonably disagree as to when the bodily injury becomes "great," the statute, for that reason alone, will not be invalidated.

As noted above, other sections of the Penal Code have used the term "great bodily injury," this term being sufficiently explained by judicial interpretation.

In *People* v. *Wells* (1971) 14 Cal.App.3d 348 [92 Cal.Rptr. 191], the court cited with approval and adopted the definition of "great bodily harm" found in *Froedge* v. *State* (1968) 249 Ind. 438 [233 N.E.2d 631], as follows: "*Great bodily harm* defines itself and *means great* as distinguished from *slight, trivial, minor,* or *moderate harm,* and as such *does not include mere bruises as are likely to be inflicted* in a simple assault and battery. . . . Whether the evidence describing such harm or injury is within the meaning of the statute . . . is generally a question of fact for the jury." (*Id.* at p. 359, fn. 8; italics in original.)

By reference to this judicial determination regarding a statute (Pen. Code, § 245) involving the same terminology, the meaning of "great bodily injury" under Penal Code section 12310 can be adequately ascertained. Consequently, there are no constitutional infirmities in Penal Code section 12310.

## 2. *There was "great bodily injury."*

Appellant contends that if Penal Code section 12310 is held to be constitutional, the evidence was insufficient to support the finding that "great bodily injury" resulted. This contention is without merit.

Whether the evidence describing the harm resulting to the victim of the alleged crime comes within the statutory definition is a question of fact for the jury. If there is sufficient evidence to sustain such determination, we are bound to accept it, even though the circumstances might be reconcilable with a contrary finding. (*People* v. *Wells, supra,* 14 Cal.App.3d 348, 359.)

In the instant case, the victim, Mr. Clarenbach, had first and second degree burns on his face, right arm, right side of his chest and right leg; he had pinpoint or small bleeding lesions scattered over his body; his eardrums had been ruptured, resulting in a severe hearing loss in the right ear;[3] he had suffered a hemorrhage deep within his right eye, and although

---

[3]Clarenbach had informed Dr. Perry that he did have some difficulty with his hearing prior to the explosion.

vision in this eye had improved to 20-20 minus one at the time of trial, he would suffer from a blurred image.

In *People* v. *Wells, supra,* 14 Cal.App.3d 348, the victim was found unconscious, scratched, and bleeding; she was cut 14 times on her arms and was scarred; her face was scratched, her cheek cut, her head bruised, and she suffered severe headaches for several days. (*Id.* at p. 353.) The court found this sufficient to sustain a finding of "great bodily injury." (*Id.* at p. 359.)

In *People* v. *James* (1955) 133 Cal.App.2d 478 [284 P.2d 527], the victim was treated for a possible nose fracture, he had a black eye, a few loose teeth, and was bleeding about the face. (*Id.* at p. 479.) This the court found to constitute "great bodily injury." (*Id.* at p. 480.)

In *People* v. *Grigsby* (1969) 275 Cal.App.2d 767 [80 Cal.Rptr. 294], the victim was hit in the temple, was stabbed four times in the vicinity of his heart and once through the muscle of his right arm, and was continually beaten. This the court held to come within the term "great bodily injury." (*Id.* at pp. 771-772.)

Nowhere do the cases indicate that in order to constitute great bodily injury, the injuries must be either permanent or visible. The injuries suffered by Clarenbach were greater than *slight, trivial* or *minor.* Consequently, we find sufficient evidence to sustain the jury's determination that "great bodily injury" was suffered.

3. *Instruction on great bodily injury was proper.*

Appellant next contends that the recent holding regarding instructions on the term "great bodily injury" in *People* v. *Richardson* (1972) 23 Cal. App.3d 403 [100 Cal.Rptr. 251], requires reversal of the instant case.

In the instant case the jury received the following instructions on great bodily injury:

"The term 'great bodily injury' as it has been used in my instructions means an injury which is greater and of a more serious character than 'bodily injury.'

"It is for your determination whether or not Mr. Clarenbach suffered such an injury in this case.

"In determining whether in regard to Great Bodily Injury reasonable

doubt exists, as the term has been previously defined, you may consider any of the following evidence:[4]

"1. The presence in Mr. Clarenbach's medical history of a nerve type hearing loss prior to December 18, 1970.

"2. The quantity of the hearing loss of Mr. Clarenbach.

"3. The quantity of the vision loss of Mr. Clarenbach.

"4. Any other evidence dealing with the severity of the injury.

"5. Any other evidence tending to prove reasonable doubt."

The cases hold that as the statute does not provide a definition of "great bodily injury" it is the duty of the court to provide guidelines for the jury in this respect. In *People* v. *Richardson, supra,* 23 Cal.App.3d 403, 411, the court approved the instruction given in *People* v. *Wells, supra,* 14 Cal.App.3d 348, 360, to the effect that the term refers to significant or substantial injury or damage and does not refer to trivial or insignificant injury, and added "It seems it would be correct to exclude 'moderate harm' as well."

The question to be determined is whether the instructions given by the trial court in the instant case laid down sufficient guidelines on the subject for the jury to follow.

The first guideline in the instructions is that the injury must be greater and of a more serious character than "bodily injury." The instruction then states, in effect, that if the jury has reasonable doubt as to whether there was great bodily injury they must find against the injury being such. The court then refers to certain preexisting conditions of the victim—a prior loss of some hearing—which the jury must consider in determining the injuries caused by appellant.

It would seem that while these guidelines are not so well stated as in the instructions above-mentioned in *Richardson* and *Wells,* nevertheless they were sufficient to advise the jury that the injury must be more severe than just bodily injury.

In any event, if the instructions were not sufficient no prejudice resulted therefrom because of the extent of the injuries received. The hearing loss in one ear was severe, in the other moderate. While there was a preexisting hearing loss, which the jury were told to consider, it cannot be gainsaid that an increase in hearing loss plus the puncture of the eardrums constituted an injury greater than mere bodily injury. Moreover, the fact there has resulted a blurring of the vision of the right eye is in

---

[4]This instruction requested by appellant.

itself a great bodily injury. These injuries could not be considered as resulting in moderate harm.

### 4. *No error in admitting testimony of bailiff.*

■ On the first day of the trial Mr. Clarenbach, as part of his testimony, drew on a pad of paper a diagram of the bomb which injured him. The bailiff was seated "at the far end of the jury box from where the Judge sits." While Clarenbach was making the drawing, the bailiff saw appellant, who was seated next to his attorney, make "a motion toward his attorney illustrating something with his hands [indicating] some type of size or something of this nature" and heard appellant say, "It was not quite like that" or "It wasn't like that." After the jury retired the judge informed counsel that, in view of the bailiff having testified as a witness, he was removing the bailiff from further attendance upon the court.

Appellant made no objection to the bailiff's testifying. Now, on appeal, he contends that the bailiff's revealing the communication between appellant and his counsel constituted a violation of Evidence Code section 954 (the lawyer-client privilege) which provides, in pertinent part, that a client "has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer . . . ."

There was no error in the admission of this testimony for two reasons: (1) the failure to object to its admission or to claim the privilege resulted in a waiver thereof (Evid. Code, § 912; 2 Witkin, Cal. Evidence (2d ed. 1966) § 783, p. 729, § 785, p. 731) and (2) "No privilege of confidential communication attaches to a statement which is made in the presence of a third person who is ostensibly present" (*People* v. *Cox* (1968) 263 Cal. App.2d 176, 188 [69 Cal.Rptr. 410] [police matron overheard defendant's telephone call to an attorney], overruled on another point, *Greven* v. *Superior Court,* 71 Cal.2d 287, 294-295 [78 Cal.Rptr. 504, 455 P.2d 432]; *People* v. *Castiel* (1957) 153 Cal.App.2d 653, 659 [315 P.2d 79] [court reporter overheard conversation between attorney and client during recess]). Evidence Code section 952 defines a confidential communication between client and attorney, in part, as a communication made "by a means which, so far as the client is aware, discloses the information to no third persons . . . ." If a communication is made so that it can be overheard by a third person, it obviously is not calculated to insure confidentiality. There is no indication that the bailiff was eavesdropping. He was seated at the far end of the jury box. "The burden of establishing the privileged nature of confidential communications between an attorney and client is upon the parties seeking to suppress the evidence." (*People* v. *Sturgess*

(1960) 178 Cal.App.2d 435, 441 [2 Cal.Rptr. 787].) Appellant has failed to meet that burden.

### 5. *The prior offenses.*

During the trial Hugh Towsey and Robert Oman were called as witnesses for the prosecution; they testified to the circumstances of the explosion of Towzey's automobile prior to the explosion injuring Clarenbach. Michael Adams, a former cellmate of appellant's, testified that appellant had solicited him in January of 1971 to place a bomb in somebody's car. Appellant told Adams that the car was a 1964 tan Thunderbird, license number DCK 848—Hugh Towzey's car. Appellant also admitted to Adams that he had been involved in a prior bombing.

"Evidence of other crimes is not admissible solely to prove the criminal disposition or propensity of a defendant to commit the crime charged. [Citations.] However, such evidence is admissible to show guilty knowledge, motive, intent, or presence of a common design or plan. But even for such purposes the evidence must be viewed with 'extreme caution.' [Citations.]" *(People v. Zismer* (1969) 275 Cal.App.2d 660, 663-664 [80 Cal. Rptr. 184].)

Before evidence of a collateral offense can be admitted, (1) ground must first be laid implicating the accused in the charge under trial, and unless sufficient evidence of this has, in the opinion of the trial judge, first been adduced, all evidence of other offenses must be excluded; (2) the collateral offense cannot be put in evidence without proof that the accused was involved in its commission; (3) there must be identity of person or crime, scienter, intent, system, or some integral parts of the exceptions established between the charge under trial and that sought to be introduced, that clearly connects the accused, showing that the person who committed the one crime must have committed the other. *(People v. Albertson* (1944) 23 Cal.2d 550, 578 [145 P.2d 7].) The test of admissibility, thus, is whether there is some clear connection between the collateral offense and the one charged so that it may logically be inferred that if the defendant is guilty of one offense, he must be guilty of the other. Or, stated in another way, the other offenses offered to prove pattern, scheme, or plan are sufficiently similar and possess a sufficiently high degree of common features with the act charged where they warrant the inference that if the defendant committed the other acts he committed the act charged. *(People v. Cramer* (1967) 67 Cal.2d 126, 129-130 [60 Cal. Rptr. 230, 429 P.2d 582].) Other cases have spoken in terms of a peculiar or characteristic behavior pattern, bizarre details, and striking similarities. *(Id.* at p. 130.)

Tested by the aforementioned standards, evidence of the collateral offense was admissible. Appellant had made the statement to Sharon that in order to hurt her he could do so better by hurting the people she loved rather than by hurting her. Thus, the relationship of Towzey and Clarenbach to Sharon justifies a finding of a common scheme on appellant's part to hurt those close to Sharon. Both offenses were committed by use of a homemade bomb. Both bombs had common distinctive features. The bomb used in Towzey's car contained a military component not available to civilians (a 90 mm tank gunfire simulator). The bomb injuring Clarenbach contained the remains of a military simulator. The use of a homemade bomb, containing similar components, establishes a sufficiently high degree of common features in both offenses. ■ Therefore, introduction of evidence of the collateral offense did not constitute error. The evidence that appellant admitted one bombing and planned another, together with the similarity of the bombs used and the common motive involved, supports a logical inference that appellant committed the crime charged. The court gave a proper limiting instruction as to the purpose of this evidence before it was introduced and at the time the case was given to the jury.

### 6. *Efficacy of counsel.*

Appellant sets forth a number of grounds which he contends demonstrates the incompetency of his trial counsel, and which denied his right to counsel as guaranteed by the Sixth Amendment to the United States Constitution. These will be discussed seriatim.

### a. *Constitutionality of Penal Code section 12310.*

As we have hereinbefore shown (topic one), Penal Code section 12310 is not unconstitutional. Consequently, defense counsel cannot fairly be charged with incompetence for failure to attack said section at the trial.

### b. *Investigations.*

Appellant contends that had defense counsel made proper investigation he would have found that ethyl cellulose wire was not, as appellant claims a witness indicated it was, a "rarity." This contention is unsupported by anything in the record, and hence cannot be considered on appeal. (See *People* v. *Pearson* (1969) 70 Cal.2d 218, 221-222, fn. 1 [74 Cal.Rptr. 281, 449 P.2d 217].) Actually, no witness testified that the particular type of wire was rare. One expert testified he had never heard of ethyl cellulose on a wire insulation. However, this fact is explained by the testimony of the director of the sheriff's laboratory, who said that wire

insulated with ethyl cellulose was only used in military detonators. The detonators in both bombs in this case were military detonators.

Obviously, in view of the evidence, there was nothing for counsel to investigate that would have helped appellant.

### c. *Failure to impeach Mrs. Greene.*

Sharon Greene testified to the many threats and harassments by appellant after she broke off her relationship with him and went with Hugh Towzey. She gave evidence which showed motive for appellant's bombing Towzey's automobile and injuring Clarenbach who was trying to protect Sharon from appellant and who was instrumental in appellant's being arrested for harassing Sharon.

■ Appellant charges defense counsel with incompetence when he failed to bring out for purposes of impeachment on cross-examination the fact that Sharon was under the care of a psychiatrist. Before the trial started the court ruled that if, when Sharon would testify, defense counsel could make an offer of proof that the psychiatric treatment was relevant to her credibility, it would consider the matter. Outside the presence of the jury defense counsel called Dr. Charles Bryant (Sharon's psychiatrist) as a witness; he claimed the doctor-patient privilege. This prevented defense counsel from being able to make the offer of proof suggested by the court. It is doubtful if asking Sharon if she were under the care of a psychiatrist, without his diagnosis of her condition as it affected her credibility, would have been admissible or of any value to appellant, particularly as her testimony was fairly well corroborated. A reading of her testimony indicates that she made a rather good witness and it may very well be, in view of the refusal of the doctor to describe her condition, that it was good trial tactics not to bring out the mere fact that she was being treated by a psychiatrist. In any event, counsel's action in this regard did not deprive appellant of a fair trial or show incompetence on counsel's part.

### d. *Failure to object to the bailiff's testimony.*

As we have shown, the bailiff's testimony was admissible. To have objected and had the objection overruled would have emphasized the bailiff's testimony, doing appellant more harm than good.

### e. *The trial court gave appellant the opportunity to question his counsel's competence.*

Appellant's contention that he was given "no opportunity to explain . . . specific instances of incompetence" is not supported by the record. On the

fourth day of the trial, defense counsel informed the court that appellant wanted to address the court concerning counsel's handling of the case. Appellant then stated that counsel was not handling the defense to his satisfaction and that appellant was not being represented in the best possible manner. Thereupon, the court asked: "Is that everything you want to say?" "THE DEFENDANT: I would like the Court to consider the possibility of a mistrial on that basis." The court then, at some length, stated that from its observation of counsel's action it felt that he was diligent, forceful and was ably representing appellant. The court then stated that it would not grant a mistrial. Appellant then stated: ". . . I have no reason to believe that he [defense counsel] has not done his best within the courtroom, but I have reason to believe that perhaps someone else could done better within the courtroom. . . . I am not satisfied that I have been properly—that the investigations and things of this nature have been taken care of to my satisfaction." At no time did appellant indicate that he wanted to give specifics and at no time did the court indicate that it would not have listened had appellant indicated such desire. Moreover, appellant did not indicate whether he desired to bring specifics before the court nor, except those herein mentioned which clearly did not justify appellant's assertion that defense counsel was not adequately representing him, has he even now stated such specifics.

#### f. *The identification of appellant by witness Hogue.*

It is not clear from appellant's brief why the identification proceedings show any incompetency of defense counsel. Defense counsel thoroughly cross-examined Hogue on all the matters to which he testified and fully objected (about four pages of the transcript) to the identification testimony, which objection was overruled. Appellant does not point out what he thinks counsel should have done that he did not do.

Actually, appellant's contention basically is that the court erred in admitting the identification testimony because, he contends, the identification proceedings prior to the in-court identification were unduly suggestive. Hogue, from whom appellant purchased a switch apparently used in the bomb which injured Clarenbach, was shown, shortly after the transaction, two photos of appellant. He was unable to identify appellant therefrom. On the day of the preliminary hearing, Hogue was asked to sit in the courtroom and see if he recognized anybody there. When he entered the room there were six to eight prisoners in the jury box, in prison uniform, some of whom were black. There were eight to ten other persons in the room. Hogue did not recognize anybody. After sitting for ten to fifteen minutes, he glanced up and recognized appellant in the jury box, there then being only two or three other prisoners in uniform none

of whom was black. Hogue testified that his in-court identification was not based on the photographs. The record is unclear as to the effect of the "lineup" viewing, but it is clear from the fairly extensive examination of the witness that his identification of appellant was, as he testified, from "a rather clear recollection of [the transaction in which the switch was purchased] because there was some peculiarity about it" and also because the transaction was rather drawn out. There was no error in admitting the identification, particularly as appellant himself testified to purchasing a switch from Hogue and appellant's check paying for it was introduced in evidence.

A study of the record shows that defense counsel rather than showing a lack of diligence or competence or of reducing the trial to a "farce or sham," which the courts hold is necessary to constitute denial of effective assistance of counsel (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487]; *People* v. *Hill* (1969) 70 Cal.2d 678, 689 [76 Cal.Rptr. 225, 452 P.2d 329]), showed great diligence and competence, especially considering the overwhelming weight of the evidence against appellant.

Judgment affirmed.

Devine, P. J., and Rattigan, J., concurred.